The Fourth District Appellate Court of the State of Illinois has reconvened. The Honorable Thomas M. Harris presiding. Good morning. This case is case number 4-23-0679. Jeremy, is it Belknap or Belknap? Belknap. Thank you. Jeremy Belknap as Independent Co-Administrator of the Estate of Stephanie Belknap versus David Crawford et al. Counsel for the appellant, could you state your name for the record? Yes. My name is David Nordwall, N-O-R-D-W-A-L-L. All right. And counsel for appellee? Fisk Drinkwine. All right. Thank you. First off, let me just apologize for our late start here. Prior case went a little bit longer than we had anticipated. Mr. Nordwall, you may proceed with your argument. It may please the court. In claims like this one involving Nurse Martin, where proximate cause is dependent upon how a third party would have responded to being provided information, the Illinois court has made clear in the Snelson case that proximate cause can be proven in two ways. First, the plaintiff can present testimony from the treating physicians themselves explaining how they would have acted differently if provided with this information earlier. Second, the plaintiff can present expert testimony of what a reasonably well-qualified physician would have done if in the position of the third party. Now, the Snelson court explained that this second approach allows a plaintiff to prove his case even though the treating doctor testifies that he would not have acted differently, regardless of what further explained that expert testimony in this scenario would create a factual dispute on proximate cause that the jury must resolve. The trial court erred in granting summary judgment in favor of Nurse Martin and Methodist Medical Center in this case because it only considered the first approach, basing its ruling on Gill v. Foster and the testimony of Dr. Crawford that the trial court found indicated that he was aware that she had some pain at the time of discharge. The trial court did not address the second approach at all or consider the opinions of plaintiff's experts when ruling on summary judgment. Because plaintiff's expert testimony created questions of fact... Good morning. Yes. If I may, with regards to Gill, first I'll ask you just briefly, it appears the Supreme Court is essentially saying that it does not matter if the nurse breached her standard of care by not providing relevant information about the patient to the doctors that were caring for the patient, as long as the doctors were aware of all of that information through other means. I'll start with asking, do you agree that that is in essence what the Supreme Court stated in their holding in Gill? In Gill? Yes, it was a situation... Yeah, I'm sorry. So then in this particular case, what information are you arguing that Drs. Crawford, Esperanza, and Saran were not aware of with regards to Stephanie's condition between the completion of her surgery and when the three doctors were visiting her early on the afternoon of the 17th? Okay, well, this is assuming that Gill analysis is the only analysis that applies here. And addressing your question with that context, because I disagree, but accepting that... Dr. Crawford relied on Gill. Yes, yes, yes, yes. So Dr. Martin admitted that he did not speak with Nurse Martin or review the nursing notes at all. And he also admitted in his deposition that he did not know that Stephanie had never reported a pain level below eight out of 10 after she left the PACU, which is the post-anesthesiology care unit, so when she went to the surgical floor. He also testified that he did not know that Stephanie only tolerated 25% of her breakfast that morning and 0% of her lunch on the day of discharge. And he also testified that he did not know that Stephanie's last reported pulse rate in the medical records was 106, which is over 100, which plaintiff's experts say is a sign of tachycardia. So that's with respect to Dr. Crawford. I'm sorry, I said Dr. Martin before, Dr. Crawford, that's what he did not know, which is information that Nurse Martin did know and was not conveyed to him. So with respect to the resident, again, they both did not know all the information. Dr. Esperos was not aware, again, that Stephanie did not complain of any pain when she was in the PACU, but then consistently complained of pain after leaving there. He was also not aware that Stephanie ate only 25% of her breakfast and none of her lunch that day. Dr. Saran, who was the youngest resident, who testified at his deposition and admitted that he would rely upon Nurse Martin to provide him with any information about inadequate responses to pain medication. He was not fully aware of Stephanie's declining condition with respect to pain, including that she was complaining of pain while under the effect of three doses of the drug. The surgical team did not have full knowledge of her consistent and worsening complaints of pain throughout her care, which was the trending downward, getting worse. They were also not aware of her trending downward of being able to keep food down, where she ate 50% dinner the night before and then 25% of breakfast and 0% of lunch. All of those are signs of an intra-abdominal problem. That's the information that they did not know. It seems that Nurse Martin and Methodist now claim that the doctor's evaluation, though, before Stephanie was discharged, severed that causal chain between Nurse Martin's alleged negligent conduct and Stephanie's injuries. Does the record support Nurse Martin and Methodist's claims that the doctor's meeting with Stephanie personally, then, provided them with all the information they needed to discharge her from the hospital? Again, for the same reasons I just said, that that information was not, the record does not show that that information was conveyed, that Stephanie was only a 25% of her breakfast and 0% of her lunch and that the constant complaints of pain. So the record does not support that she was, that they were aware of that information, even with the meeting. Even with the suggestion, and I'll just use by way of an example, that they were, appeared to be at least concluding she was tolerating a liquid diet, despite those statements. Right, but, and that's questionable as well, because six minutes before she was discharged, she was given anti-nausea medication, which suggests that that's not true either. So the record does not bear that out either. But, and I understand that the residents and Dr. Crawford are saying that all these other concerns didn't matter to them because they met with Stephanie and felt, yeah, she's okay to go. But that's what the Snelson court addressed and said, I mean, that's essentially arguing that the screening physicians are saying that we didn't care about this other information because it didn't affect our decision. But the Snelson court made clear that the plaintiff can still go forward with his case if he has evidence of expert testimony, which is what we have here. So. Counsel, I have a question. I want to make sure I understand the factual context of this case, and particularly with regard to any differences with Gill versus Foster. In the Gill case, is my understanding correct that the lawsuit was negligence of its employee, the nurse, in communicating to the physicians who were taking care of the patient what his condition was? Yes. And a specific condition, which was that they failed to convey that he was complaining that the plaintiff was complaining of chest pain. Okay. And in that case, where the, the examining physician, the patient's physician who ultimately discharged the defendant himself, a defendant in that proceeding? You know, I believe he was as well, because they were only addressing with partial arguments with respect to summary judgment on some of the claims. So I, but I cannot tell you with certainty. I can certainly look in the break and I can answer Here's, here's my question was, was, was there an issue in that case that, well, in this case, if I understand correctly, you're saying that the nurse was negligent for not communicating to the treating physician what Stephanie's condition was before she was discharged? You're, what the defendant says is it wouldn't matter because the treating physician says, essentially, I knew that stuff, or even if I was told all that, that wouldn't have made any difference in my ultimate treatment. Is that correct? I'm sorry, could you repeat that? Is my understanding correct that the physician in this case is saying, had this all been communicated to me explicitly by the nurse, it wouldn't have made any difference to my decision to discharge Stephanie. Is that correct? Um, I think that's the effect of his testimony, that his testimony didn't rely upon what the nurses said, and then his own evaluation and relied on what the residents said. Yes. And he's a defendant himself in this action. And it's essentially your claim, if I understand correctly, that he was, he improperly discharged Stephanie, and that his testimony that had he even been told all this explicitly by the nurse, he still would have done so. That, that is contrary to the appropriate standard of care under these circumstances? Yes. Okay. Well, the reason I asked that is, it seems to me that this is not the same issue in Gil versus Foster, which was a case where the focus was essentially on what the nurse said, and whether or not that constituted a negligence in the hospital by respondeat superior, who is the nurse's employer. Your claim here is that multifold, if I understand correctly, the nurse was negligent, she should have mentioned this, and that her negligence is actionable. And the doctor, his testimony that wouldn't have mattered is itself a claim that is contrary to appropriate medical standard, given all of these circumstances. And that had he been told this, that he certainly should not have discharged her. And that's what your expert, you presented, testified to? Yes. Yes. Exactly. Again, I want to make sure my understanding of the sequence of events is correct. I thank you. By the way, thank you for short declarative answers. Yes, it really will work often. And I try to keep when Mr. Drinkwine is, has an opportunity to address this court. I'd look forward, Mr. Drinkwine, if any of these, if your assessment of any of these questions I asked of Mr. Nordwell is different, please let me know. Mr. Nordwell, you can continue now, sir. Okay. Well, and where I'd like to continue, that I hopefully indicated in answering some of these questions is that there was a question of fact under the Gill analysis. There's a question of fact, whether the treating doctors in this case knew all of the information that was known by Nurse Martin. And again, as Justice indicated, in the Gill case, the issue was, did the nurse convey to the treating doctors that the plaintiff was suffering chest pain? And the evidence in that case showed that the doctor knew for days before discharge that the plaintiff was suffering from chest pain and felt that it was just a normal process in the recovery process and so didn't care. And furthermore, the plaintiff actually told the treating doctor right before discharge that he was having continuing complaints of chest pain. And so in that situation, the Supreme Court said that even if the nurse breached the standard of care by failing to tell the doctor that the plaintiff was complaining about chest pain, it made no difference because there was no factual dispute that they were aware of, that the doctor was aware of the complaints of chest pain. And that's different from this case for the reasons that I discussed, where I identified the information that was not known. But even under the Gill analysis, again, the Snelson Court made clear that there's two analysis. And what the Snelson Court made clear, and this was nine years after Gill, was that they were addressing the argument made by plaintiff that the plaintiff said, well, Judge, under Gill, the plaintiff can never prove their case if the treating doctor says, it didn't matter, or I knew that information or didn't matter. And the Snelson Court said, no, that you can still, you can always prove your case by having expert testimony showing what a doctor following the standard of care would have done with the information. And that's what has been done here. Now, there's expert testimony that creates question of facts of what a treating physician would have done. The expert testimony in this case is from plaintiff's nursing expert, Polly Zeriman, who opined that Nurse Martin breached the standard of care by failing to tell the surgical team physicians about Stephanie's complaints of pain, her pain levels, the inadequate pain relief, and her fluid and dietary intake. She also opined that Martin's negligent lack of communications was a contributing factor in Stephanie's premature discharge, and that had nurse properly notified the surgical team physicians about Stephanie's condition, Stephanie could have remained in the hospital and a timely diagnosis and treatment could have occurred. Is that testimony from the expert before the court in an affidavit or deposition? They did. And yes, they did depositions. Deposition testimony and the 213 disclosures. Was there any contrary evidence presented by the defendant that Nurse Martin's conduct was within the appropriate standards of medical behavior? Of course. The defense all testified that they acted within the reasonable standard of care. But we're not looking for summary judgment on that on that issue. The defendant testified to that. Were there expert testimony offered as well? They had expert testimony as well. OK, go ahead. Yes, there's Mr. Nordwald. If I might interrupt you here in regards to proximate cause testimony, how can a nursing expert provide that? Don't you need a position to provide proximate cause testimony? And we do have that as well. But the nurse and that's primarily the general surgeon expert who is Dr. Jeffrey Allen. OK, and specifically, what does Dr. Allen say in regards to proximate cause relative to Nurse Martin's actions? OK, and yeah, he said that it was a breach of the physician standard of care to discharge Stephanie on January 17th because she had an unresolved intra-abdominal complication. And this was shown by her unmitigated pain, her inability to eat, and her worsening vital signs. And he said that if this information was possessed by the doctors and if Nurse Martin would have shared it and was known to the surgical team, the standard of care for a physician required them to keep Stephanie and Methodist overnight. And specifically, I'll give you the exact quote from his deposition testimony, which is on page 859 of the Record on Appeal. He says, quote, I think if someone had the bad pain, has the inability to eat, and has the tachycardia, then I think to be within the standard of care, you would keep the patient overnight, you would check for an additional night, and you would check labs. And if there was a worry for a perforation, you would do a gastrograph and swallow x-ray. So was Dr. Allen aware that Nurse Martin had testified that yes. Dr. Allen, that's part of his opinions on this. This is the unmitigated pain. This is where she's in pain, even though she's under multiple doses of morphine. And sort of to close the circle here, Dr. Allen also opined in his 213 disclosure, and this is on page 1141 of the Record, and I'll put it in, I'll quote it for you as well. Quote, it is far more likely than not that if discharge had been delayed to further monitor Stephanie's declining condition, surgical intervention to revise the failed hernia repair would have been completely successful with no complications and prior to extensive abdominal sepsis caused by the perforation. So finally, plaintiffs also have an infectious disease expert, David Tallon, who opined that the sepsis, that Stephanie developed sepsis and died because the January 16th surgery broke down and failed. And that this occurred before, the failure occurred before Stephanie was discharged. And Dr. Tallon explained that Stephanie's post-operative complaints of severe pain, which she rated as 10 on a scale of 10, and her poor oral intake were highly suggested that the surgery had already failed. He also again opined that had the failed surgery and rupture been recognized before Stephanie was discharged from Methodist and had surgical repair to antibiotics been given, as would standardly be done, she would have survived. So together, globally, this expert evidence establishes that had Nurse Martin properly alerted physicians about Stephanie's complaints of pain and pain levels, the inadequate pain relief that she received from medication, and her low fluid and dietary intake and her vital signs, a physician following the standard of care would have kept Stephanie in the hospital for further monitoring. The failed surgery would have been discovered and treated and Stephanie would have survived. This expert testimony shows that Stephanie's condition would have been different and treating physician complying with the standard of care would have acted differently if Nurse Martin had not breached the standard of care. And instead, she had conveyed the information about Stephanie's condition. Other courts presented with this issue, including the Buck versus briefs, correctly found that expert testimony created a standard of fact on proximate cause in this type of case. The same is true here, and the trial court erred in giving dispositive weight to Dr. Crawford's testimony and not considering the plaintiff's expert testimony. I don't know how much time I have left. Well, it's indicating you don't have any. I don't. I was going to say, unless the court has other questions, I will stop. Okay, thank you, Mr. Nordweil. You'll have time in rebuttal. Mr. Drinkwine, you may proceed with your argument. May it please the court, Chris Drinkwine, and good morning, counsel, Chris Drinkwine, on behalf of Nurse Cynthia Martin and Methodist Medical Center of Illinois. Our Supreme Court's decisions in Gill v. Foster and Snelson v. Cam don't provide alternative means of proving probable cause. They set forth ways that the probable cause chain is broken. Are you saying proximate cause? I'm sorry. Thank you, Judge. Proximate cause. Proximate cause is broken in two different ways in Gill and Snelson. They're not, as counsel indicates, ways of proving proximate cause. In Gill, it was uncommunicated information that the doctor was aware of. In Snelson, it was uncommunicated information that the doctor was not aware of, said that he didn't need to be aware of to make his decision. The causal chain was broken in both cases. The first one, it's broken because the nurse's failure to communicate didn't matter because the doctor had the information. In Snelson, there was testimony that the information didn't make any difference. Significantly, no expert testimony to contradict that, like we have in this case, and like we had in the Buck case, and like we had in the Shichingao case. Shichingao and Buck are just applications of the explanation that was set forth in Snelson, where there wasn't expert testimony. The point here is, of course, we're not under Snelson, we're under Gill. The circuit court was entirely correct in concluding that Gill was in their reply brief. The felons assert that you do not dispute that the trial court never considered the testimony of plaintiff's experts when granting summary judgment. Is that correct? I do not dispute that, and neither should this court, because we're under Gill, not Snelson. Well, does that mean that evaluating whether or not summary judgment was proper, that the expert testimony offered by plaintiffs, that the doctor deviated from the appropriate standard of medical care, wasn't to be considered? That's right, because... Why is that? I don't understand how that follows. Because it has no bearing on Nurse Martin's liability. The... Going back to my question I asked of Mr. Norwell, Nurse Martin isn't the only defendant in this case. The doctor, I forget his name here, Dr. Crawford is a named defendant himself, alleged to have violated the appropriate standards of medical treatment, isn't he? That's right. Well, so the plaintiff has presented evidence that based upon... Well, I guess it's a hypothetical. Dr. Crawford said, if I had been told all this, it wouldn't have mattered to me. And the plaintiff presented an expert that says it should have mattered to him, and that his statement that it wouldn't have mattered to me is contrary to appropriate standard of medical treatment. Why isn't that sufficient to create a question of fact for a jury to resolve with regard to Dr. Crawford? Your Honor, he had all the information. He received all the information by reviewing the medical chart in the afternoon. He received information from his residence through the surgical chain of command. So neither his testimony that he had everything he needed and wouldn't have done anything different or Dr. Allen's testimony contradicting that matters. That's our- Well, maybe I'm not being clear, counsel, but let me try again. And it's possible I'm not being clear. I'm not saying this facetiously rhetorically. I understand Dr. Crawford says I had that information and wouldn't have mattered. But it's that determination that the plaintiff is challenging. And why isn't it if he is an expert witness, and it seems to me he does, who says it should have mattered for Dr. Crawford that had, let's assume for the purposes of this case, he had all this information that Nurse Martin should have provided to him. It should have mattered to him, and he should have done further steps before discharging Stephanie. Why isn't that sufficient to state a cause of action or to get the unsummary judgment as to Dr. Crawford? Because we only deal with the Snelson approach if he didn't have all the information and then said it wouldn't have made any difference. If he had all the information and he did, then we're under Gill. And if he proceeds to be negligent and prematurely discharging her after he has all the information, that's on him and it breaks the causal chain between any failure and any breach of the standard of care by Nurse Martin for failing to give him the information that he had. Well, let's assume probably that for just a moment, it seems to me that that might be the basis of an argument for why Nurse Martin should, for summary judgment as to her, would be appropriate since the chain of causation was broken and all that. But how does this follow that Dr. Crawford is not negligent given what he knew and what he might have known, given how the expert physician from the plaintiff said, no, he should never have discharged this patient? Your Honor, I'm not arguing that Dr. Crawford was not negligent. I'm arguing that's one of the things I wanted to make clear here. So go ahead. Dr. Crawford's case, you know, we're up on 304A. This was summary judgment for Nurse Martin and Methodist Medical Center only. Dr. Crawford's, the claims against Dr. Crawford are pending before the circuit court and those will proceed regardless of the way this appeal comes out. I represent Nurse Martin in the To be more clear then, and thank you for pointing it out to me, if the plaintiff's expert says that this information from Nurse Martin was important and necessary for a competent and appropriate treating physician to have before determining to discharge Stephanie and it was failure on Nurse Martin's part to provide it, if I understand correctly, you're saying that because Dr. Crawford said it wouldn't have mattered to me, that trumps anything else? No, Your Honor. I'm saying that Dr. Crawford and the surgical team had all the information that plaintiffs claim Nurse Martin should have conveyed. And once they have all that information, the causal chain is broken under Gilby Foster. Well, just pausing right there, as a matter of fact, it seems to me that they didn't have all this information, that maybe Dr. Crawford is saying it wouldn't have mattered to me had I known it, but the information about that Mr. Nordwall was just talking about, where in the record does it show that that was definitively communicated to Dr. Crawford? So, Your Honor, you're correct. Plaintiffs argue that this case is not like Gilby Foster because there are questions of fact, whether Dr. Crawford had the full and complete patient information, her precise patient information. Now, plaintiffs claim that Dr. Crawford testified on pages 754 through 755 of the record on appeal that he was not aware that Ms. Belkamp had never reported pain below eight out of 10, that Dr. Crawford was not aware that she only tolerated 25% of her breakfast and refused lunch, and that he was not aware that her last recorded pulse was purportedly over 100, or what they call tachycardic. But that's not what Dr. Crawford said. On those pages- Where did that come from? Well, that's, again, pages 754 to 755 of Dr. Crawford's deposition testimony. And if you carefully look at that, he's asked if he was aware at discharge that her last reported pain level was 10 out of 10, and he said, I don't recall being told that. Then he was asked if he was aware at discharge that she tolerated 25% of her breakfast, and he said, I don't recall that specifically. And he was asked if he knew that she completely refused lunch, and he said, I don't recall. And then he was asked about her last recorded heart rate at discharge. He was asked if he was aware at discharge that her last recorded indicated tachycardia, and he didn't answer that question. Instead, he began to explain what tachycardic means to surgeons. So it seems to me that you're finally parsing these responses being something that says, well, in effect, he did know that, even though it sounds to me like he didn't, and this is a motion for summary judgment. All the reasonable inferences are to be drawn in favor of the party against whom the motion is brought, and why couldn't, as argued by Mr. Norville, trier's effect conclude based upon the testimony that you've just cited that perhaps Dr. Crawford didn't have this information? Your Honor, because if you look at the testimony, what he's saying is, I don't remember people telling me those things. But the record also shows, and this is at 748 of the common law record, the record also shows that he charted, that in his note, he charted that at the afternoon evaluation, he reviewed the electronic medical chart. And at that point, at 1.15 in the afternoon when he evaluated Ms. Belknap along with his two residents, that chart included all the precise information that we're talking about. So just because he testifies that he doesn't remember being told these things isn't inconsistent with the other proof in the record that he indeed reviewed Ms. Belknap's electronic medical chart. So you're claiming, if I understand correctly, that the chart was prepared by Dr. Crawford? No. But when I say chart, you know, it all goes into the EPIC system. It's all on the computer, of course. And when he's testifying on page 748 to 749, it bleeds into 749, if memory serves. He says, yeah, here, I found it in the record. Here's my note about my afternoon evaluation at 1.15 on January 17, 2017. And he says all the things he did. And one of the things that he wrote in his note is that he reviewed the electronic record. Excuse me for interrupting. But from that, are we, and was the trial judge to infer that Dr. Crawford reviewed every single thing that was in the electronic record? Is that what were to infer his base of knowledge was then? Or wasn't it the responsibility of the lawyers to elicit from him in deposition testimony the exact things that you're wanting to assert here that he knew that he, in fact, reviewed those things in the electronic record? Because it seems like a real leap to be able to say definitively, Dr. Crawford reviewed all of these things that you're wanting to pick out right now that would support the proximate cause argument simply because he made a generic statement that he reviewed the electronic record. I understand your question, Your Honor. And the note speaks for itself. He said he reviewed the electronic record. But his information- Counselor, if I may, though, he also testified that he relies on the nursing staff to communicate pain and other issues to him about the residents. And he does not review the nursing notes in the medical chart unless they draw it to his attention. So how are we to reconcile that in the context of a summary judgment motion? Well, he did say that, Your Honor. And I think the way you reconcile that is you have to, and you just referred to it, it's the surgical chain of command through which the information flows from the nurses to the residents to the attending physician. But if he's indicating even if you accept he reviewed the medical record, we're talking about Nurse Martin, and here he's suggesting he doesn't review her notes. And I don't know where in the record you would find specifically that she advised him specifically of any of these issues with regards- Yeah, that's not in the record. Nurse Martin specifically said she never communicated with Dr. Crawford. That's not- That's a point I'm making. I don't agree with anything that advised, she advised him. So if there is a gap, if you will, with regards to the three doses of morphine, with regards to the fact she took anti-nauseas and she was dry heaving, unless she did that orally, it seems he would not have found it in the notes by his own testimony. And there's no suggestion that she notified him orally of any of that information. I just want to make sure I'm correct in that review of the record. I think you are. Yeah. She didn't communicate anything to Dr. Crawford. And there's nothing in the record to contradict Dr. Crawford's testimony that he reviewed the electronic record. And after getting all that information still prematurely discharged the patient. But even if you don't accept that, Your Honor, if you don't accept the evidence showing that Dr. Crawford received this precise information from the medical chart, the plaintiff's argument that Gilvie Foster is not controlling is still without merit because it fails to recognize that Dr. Crawford relies on the residents to convey the post-surgical information to him through the surgical chain of command. In the reply brief, plaintiffs do not dispute that the residents were aware of Ms. Belknap's precise self-reported pain levels, that she tolerated 25% of her breakfast and none of her lunch, and they knew what her vital signs were. Therefore, if Dr. Crawford did not have the precise patient information when he prematurely discharged Ms. Belknap, that premature discharge was proximately caused by the residents' failure to communicate this precise information to Dr. Crawford, not by any failure to communicate on Nurse Martin's part. And in that circumstance, the case is still controlled by Gilvie Foster, and we don't need to talk about Nelson or what it would have done in the contradictory testimony. There's just a variation on Nelson. It's not information that Dr. Crawford knew, but it's information that he should have known through the surgical chain of command. So the variation on Gil is that if Dr. Crawford did not have all the precise patient information that they're claiming Nurse Martin failed to convey to him, the residents did, and then the premature discharge was proximately caused by the residents' failure to communicate, not by Nurse Martin's. Once the surgical team had all the patient information that Nurse Martin failed to verbally communicate, the causal chain between her failure to communicate and Dr. Crawford's decision to prematurely discharge Ms. Belknap was broken. Now, defendants claim or complain that, I'm sorry, plaintiffs complain that we don't cite any authority for that argument, that the residents' knowledge of the full and complete patient information breaks the causal chain. But the concept is straightforward. Our Supreme Court in Simons v. Garces and many other cases has made clear that in a medical malpractice case, there's two distinct requirements for proximate cause. Actual cause of the plaintiff's injury, otherwise known as cause in fact, and the legal cause. And the cause in fact can be established only where there's a reasonable certainty that a defendant's acts caused the injury or damage. Any reasonable certainty that Nurse Martin's failure to communicate caused the premature discharge goes away once the residents obtain the patient information. If I can interrupt, because I do have one more question with regards to the review of the record. It appears that Stephanie had multiple painkillers when she was directly assessed by the doctors at the time of discharge. Does the record clearly reflect that the physicians knew this, meaning the amount of the painkiller that was in her system? And specifically, where in the record would I find that? Well, it's in the chart for sure. And as I've argued, both the residents and Dr. Crawford testified that they reviewed the chart. So, you'll find their knowledge of the, I think it was Hayset, I don't know if that's morphine, but the chart entries were explained by Nurse Martin. And then you have the testimony of both the residents, Drs. Esperes and Saran, that they reviewed the chart in the morning and in the afternoon. And then Dr. Crawford's testimony explaining his note that he specifically charted that he reviewed the chart. So, there's no evidence to contradict the fact that they knew that she was on painkillers, that she was still on pain medication and still reporting 10 out of 10 pain and so forth, or at least high pain levels and prematurely discharged her even while they knew that. All right, Mr. Crankwine, you're out of time. Mr. Gardwell, rebuttal argument? Yes, and I'll be very brief. Council began by saying that Snelson and expert testimony did not provide an alternative means of proving proximate cause. If you look at the Snelson case itself, it very much did. And this is on page 46 of the Snelson opinion where it says, a plaintiff would always be free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was approximate cause of the plaintiff's injury in order to discredit a doctor's assertion that the nurse's omission did not affect his decision making. In such a case, a factual dispute as approximate cause would be created sufficient for the jury to resolve. And that's what we have here. Defense counsel's argument is essentially the court just ignore plaintiff's expert testimony, which shows that there was a breach of the nursing standard of care, that if the information, if the nurse would have told the treating doctor this information, would have been an advocate for the patient and convey and told them this information, that the standard of care required a treating doctor to not discharge and to keep her from monitoring. Keep her in the hospital for monitoring. Excuse me, counsel. I think that is Mr. Drinkwine's argument from the standpoint of even the phrase you referenced from Snelson talks about undisclosed information. He suggests with regards to Gill and the facts of this case, that to some extent he can't ignore that expert witness because we have a situation where we're talking just about Nurse Martin and Methodist, if you will. And that Nurse Martin, all that information was provided and Dr. Crawford was aware of everything, whether it was from the residents or the nurse. And he's relying heavily, it appears to me, on the statement that Dr. Crawford's notes indicate that he relied on the medical record. And so how do you address that in the context of specifically Nurse Martin? Well, we know that he did not rely upon the nurses, the notes of Nurse Martin, because he testified that he did not rely upon the nursing notes. So we know that he did not review the complete record. And we know when he and it's a question of fact as to what knowledge he even had because he didn't review the nursing notes. It's undisputed that Nurse Martin never approached him and said, hey, Dr. Crawford, you need to know, you need to see this, you need to know that. And he testified that he did not recall her being told all this information that we went through about the pain, about the vitals, about her ability to eat food. So there's questions of fact on all of that in this case anyway. The doctors in the chain of command, if you will, what information did they not have that Nurse Martin would have had? Well, we know that there is no evidence that they knew that the doctors were aware of the constant pain throughout, that she was complaining of pain from the lowest she ever got was an eight. And that was even actually an hour into the medication. And that she was when the medication wore off, she was making a complaint of 10 out of 10. We know, and Dr. Saran said when he saw her at 7.30 in the morning and made the recommendation that she not be discharged for at least 12 to possibly 36 hours later that she was not in a position to discharge because of her pain, which is the same pain level that continued throughout the day. He did not know that she was complaining of pain while under the influence of three doses of morphine at that point in time. So he wasn't aware of that. So there's no evidence that Nurse Martin's, the information she possessed, all of it was in their possession because they didn't review the notes. They didn't review the nursing notes. They relied upon the nursing staff from Nurse Martin and the nurses to come to them and tell them if there's a complication or a problem. And it's undisputed that Nurse Martin did not do that in this case. And that Dr. Crawford testified that he relied upon the residents and not the nurses does not extinguish Nurse Martin's liability because there can be more than one proximate cause of a plaintiff's injuries. In this case, there's expert testimony that Nurse Martin breached the standard of care by failing to directly communicate Stephanie's trending deteriorating condition to the doctors. And there's expert testimony of a standard of care for a physician who is told about these trends, about the pain, about the inability to eat, about the tachycardia, that the standard of care for a physician with that information would keep Stephanie in the hospital. And if Stephanie remained in the hospital, they would have diagnosed the failed surgery and she would have survived. So for these reasons, unless the court has other questions, for these reasons, I ask that summary judgment be reversed. Okay. Thank you, Mr. Nordwell. Thank you both for your argument. The court will take the case under advisement and will issue a written decision.